IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| PATRICIA DUDLEY, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 11-3020-CV-S-ODS ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

**ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in November 1958, has an eight or ninth grade education, and has prior work experience as a waitress and fast food worker. She filed a claim for benefits under Title II and Title XVI in August 2007, alleging she became disabled on November 30, 2006, due to a combination of bipolar disorder, back pain, and gastrointestinal problems.

While Plaintiff worked until November 2006, she began receiving treatment at Burrell Behavioral Health ("Burrell") in March 2003. At that time she reported feeling "somewhat depressed" and expressed a desire to get back on medication; apparently, she had been receiving medication from another doctor but had stopped going to that doctor and had been off her medication for approximately six weeks. R. at 267. The psychiatric history reflects Plaintiff had history of drug abuse, she reported she was "sober from alcohol for six years and clean from marijuana and methamphetamine for

two and a half years." R. at 268. Plaintiff was diagnosed as suffering from bipolar disorder and assessed with a GAF score of 60. She was prescribed Wellbutrin and told to return in one month. R. at 269. However, Plaintiff did not return until almost three years later. On January 3, 2006, Plaintiff reported "that when she goes 2-3 days without medication she becomes more irritable and that noises bother her." The medication she reported taking was Zoloft and Wellbutrin.[1] Plaintiff indicated she was sleeping eight hours, was working as a waitress, and described herself as capable of performing household tasks. R. at 262. "She was encouraged to stay in therapy and to take medications as ordered," provided prescriptions for Zoloft and Wellbutrin, and told to return in three months. R. at 262-63. Plaintiff missed this appointment and did not return to Burrell until July 18, 2006. At that time Plaintiff reported that she was "pretty good as long as she stays on medication" and that she experienced "relative euthymia, except for when she was without medication." R. at 260-61. Plaintiff's medications were refilled and she was instructed to return in three months. R. at 261. Instead, Plaintiff returned five months later and reported that "she is doing okay, except for the last two months" and described a series of custody issues involving her 11-year-old son. (Disciplining her son had been a source of stress through the preceding years). Plaintiff also reported that she had not been taking her medication at the times it was prescribed and sometimes forgot to take it altogether. Her prescriptions were refilled and the importance of taking them regularly and when instructed was emphasized. R. at 258-59.

      Plaintiff returned to Burrell to commence individual therapy in April 2007. She complained of stress, anxiety, sleeping problems, memory problems, and inexplicable crying spells. She reported being off of alcohol, methamphetamine and marijuana for ten years and expressed concerns about her ability to care for her son. Testing revealed that "[h]er memory was good for both recent and remote events with good recall of both" and she "seemed capable of insight and her judgment was unimpaired."

---

[1] The Record does not reflect where (or whether) Plaintiff was receiving medication.

Plaintiff's GAF score was 60. The therapy plan involved (1) maintaining regular visits to the medical staff, (2) staying sober, (3) learning relaxation techniques to help deal with anxiety, and (4) "learning some ways to deal with her memory problem such as always writing things down." The prognosis was "only fair due to her memory problems," even though the aforementioned testing revealed that her memory was good. R. at 254-57. Plaintiff attended two therapy sessions later that month; there is no record that she continued therapy. During those sessions she was advised to join a group to help with co-dependency issues (based on a myriad of events then occurring in her life), but there is no indication Plaintiff did so. R. at 252-53. In May 2007, Plaintiff revealed she had "been out of Zoloft about a week" and reported increased memory problems that resulted in her losing her waitressing job. She also reported increased problems sleeping, so her Wellbutrin was refilled and her Zoloft was replaced with Trazadone. R. at 250-51.

In October 2007, Dr. Elissa Lewis completed a Psychiatric Review Technique Form. Dr. Lewis' opinion was based on the medical records to that date; she did not personally examine Plaintiff. Dr. Lewis considered whether Plaintiff's condition satisfied Listing 12.04 and concluded it did not. She first indicated that Listing 12.04's "A" criteria was not satisfied. With respect to the "B criteria," Dr. Lewis indicated Plaintiff's records demonstrated mild restrictions in the activities of daily living, the ability to maintain social functioning, and the ability to maintain concentration, persistence and pace, with no episodes of decompensation. Finally, Dr. Lewis indicated the "C" criteria was not met. In her written comments, she indicated Plaintiff's allegations "appear to be out of proportion" to the results of her examinations, and that Plaintiff's allegations were "partially credible and non-severe." R. at 290-301.

The next record of treatment for Plaintiff is from February 19, 2008, when she began going to the Kitchen Medical Clinic (the "Kitchen Clinic"). She reported "symptoms of depression, sadness, loneliness, decreased concentration, fluctuating energy level, fluctuating appetite and occasional panic attacks." She "described near daily anxiety attacks for the past couple of years which lead to not wanting to leave the house or missing important appointments or work" and complained of "problems with

3

memory." Plaintiff reported that she had been prescribed Lexapro but did not mention that she had been taking any medication that had been prescribed; instead, she "indicated she was using marijuana as a way to relax or deal with her anxiety." R. at 313-14. In any event, Plaintiff was prescribed Celexa until she could see a doctor and was also referred to the Robert J. Murney Clinic at the Forest Institute for therapy. R. at 315. On March 27, Plaintiff told the doctor at the Kitchen Clinic that she "felt calmer on meds, but running out and someone stole some of her Celexa. Had been continuing Lexapro." The doctor discontinued the Lexapro and prescribed Celexa (sometimes referred to as citalopram) for depression and Tegretol (sometimes referred to in the records as carbamazepine) for bipolar disorder. R. at 311. These medications were refilled without an appointment on April 24. R. at 310.

     Meanwhile, Plaintiff went to the Forest Institute for therapy on April 16. Plaintiff described a variety of problems in her life, most of which involved her son and her relationships with her mother, other relatives, and other people in her life. She reported that she last worked in November 2006, at which time she had a "breakdown" and was fired. She tried to work at Arby's but had "difficulty focusing at work and makes a lot of mistakes. In addition she always had difficulty with time management and has a history of being late for work." Plaintiff indicated the medication was "beginning to stabilize her moods" and confessed that she was "still using marijuana 2-3 times a week to 'self-medicate' her anxiety." While Plaintiff "rapidly jump[ed]" from topic to topic, it was noted that she "demonstrated fair insight into her personality drives and mental health issues" and no memory impairments were noted. Her GAF score was 55. The therapy plan included plans for weekly individual therapy sessions and renewed involvement in AA. R. at 414-17. At her first meeting the following week, Plaintiff admitted "she does forget a dose or two a week" of her medication. R. at 413. On May 7 she reported that "her medications are working fairly well in keeping her mood modulated" but she was still using marijuana two to three times per week. She also described herself as "unable to work well much beyond 4 hours a day because she loses her ability to stay focused on task and to think clearly." R. at 411. On May 21 Plaintiff "reports continued mood stabilization w/ med compliance." The conversation that day focused on her housing

4

situation (which included continuing to allow her brother and boyfriend to live in her home despite the financial strain this presented). The therapist also noted Plaintiff "did not complete any homework assignments" and she was "assigned" the task of "gaining information about housing options. R. at 406. On June 3, Plaintiff "stated she has been feeling more tired and worn out – possibly due to meds or due to increased hours at work. She often feels overwhelmed by her house and what all she needs to do there to move and becomes paralyzed and unable to get anything done." R. at 405.

Plaintiff missed the next two or three appointments, but returned on June 25. While she reported "trouble setting and maintaining her priorities," she also seemed to be compliant with her medications, which made her moods "much more stable and more manageable." R. at 401. Plaintiff made similar statements about her medication the following week, at which time she also "reports improved motivation to clean her house and begin packing for upcoming move." R. at 400.

In August 2008, Plaintiff told both her therapist at the Forest Institute and the doctors at the Kitchen Clinic that she was experiencing stress-induced constipation and diarrhea. R. at 308, 395. The doctor refilled her medications and added prescriptions for Buspar (for anxiety) and dicyclomine (for irritable bowel syndrome ("IBS")). R. at 308. The therapist at the Forest Institute noted Plaintiff "looked tired, drained and as if she had been crying. She was frequently tearful in second half of session." Plaintiff told her therapist she stopped using marijuana three weeks prior. R. at 395.

The following week, Plaintiff reported the new medication resolved the nervousness, anxiety, and uncontrolled crying – although she indicated she was more tired and "spacey." R. at 394. On August 26 Plaintiff "reported having increased physical consequences of her mood swings, especially high anxiety states" and that she was recently diagnosed with IBS. She was "still adjusting to new meds and is still sleeping excessively, but she is able to get up and get to work." R. at 392. On October 7 Plaintiff "reported mood stabilization for past few weeks with med compliance, which has increased her ability to engage in solution oriented thinking. She is also responding well to IBS medications." R. at 388.

Plaintiff underwent a consultative examination performed by Dr. David Lutz on September 18, 2008. Inconsistencies between Plaintiff's records and Plaintiff's statements during the interview caused Dr. Lutz to opine as follows:

> If her description is accurate, then she may well meet the criteria for bipolar I disorder. It concerned me that the reviewed reports indicated dysthymic disorder. As these reports did not describe manic behavior, I wondered whether her behavior has only now developed or whether she was overstating her situation. Her behavior was certainly consistent with a hypomanic state.

To summarize this statement: Dr. Lutz indicates that if Plaintiff's statements to him during the consultative examination suggested problems far more serious than those reflected in her medical records. This led Dr. Lutz to conclude two possibilities: either (1) Plaintiff's condition had worsened recently or (2) Plaintiff was overstating her symptoms during her discussion with him. Dr. Lutz also indicated "concern" about her performance on tests of memory and indicated Plaintiff's "short term memory and long term memory were consistent with her general intellectual functioning, which I would estimate to be in the low average to possibly average ranges." He assessed her GAF score at 50. R. at 333-38. Dr. Lutz also completed a Medical Source Statement ("MSS"), which indicated Plaintiff has marked limitations in her ability to understand, remember, and carry out detailed instructions, make simple work-related decisions, or respond appropriately to pressure in the workplace. The MSS also indicated Plaintiff is moderately limited in her ability to understand, remember, and carry out short, simple instructions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to changes in the workplace. Dr. Lutz also wrote a note advising the reader to consult his full report for his "concerns about the accuracy of this diagnosis." R. at 330-31.

Plaintiff's therapy sessions at Forest Institute between October 7, 2008, and her last session in May 2009[2] were marked by recurrent themes of (1) forgetting to take her

---

[2] Plaintiff's counsel indicates Plaintiff went to the Kitchen Clinic sometime in June, and during the August 2009 hearing Plaintiff indicated she was still going to the Kitchen Clinic. However, there are no records from any visits after May 2009.

6

medication, (2) concern about her living situation, which was exacerbated by allowing her brother and boyfriend to live in the house, and (3) concerns about her mother, son and other family members. Plaintiff's therapy at the Forest Institute was also marked by numerous canceled and missed appointments, many of which were missed because they conflicted with her work schedule.

On June 4, 2009, Nurse Mary Sturdevant from the Kitchen Clinic completed an MSS. She indicated Plaintiff is markedly limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, maintain a regular schedule, and respond appropriately to changes in the workplace. Nurse Sturdevant also indicated Plaintiff is moderately limited in her ability to understand, remember and carry out short/simple, instructions, sustain a routine, work with others, make simple work-related decisions, respond to criticism, get along with co-workers, and "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." R. at 361-62, see also R. at 364-66. Approximately seven weeks later – without the benefit of further visits from Plaintiff – Nurse Sturdevant provided an updated MSS that indicated Plaintiff was extremely limited in virtually all categories listed. R. at 436-37.

On July 16, 2009, Dr. Kent Franks and Ms. Shelly Harvill from the Forest Institute completed an MSS. Ms. Harvill was the therapist who saw Plaintiff, and Dr. Franks was the supervising psychologist.[3] The MSS indicates Plaintiff extremely impaired in her ability to maintain attention and concentration for extended periods, maintain a schedule, complete a workday without interference from psychologically-based symptoms, respond to changes in the workplace, and set realistic goals. The MSS also indicates Plaintiff is markedly impaired in her ability to understand, remember and carry out detailed instructions and moderately impaired in her ability to carry out short/simple instructions or work in coordination or proximity with others. R. at 423-24.

---

[3]The Forest Institute "is a training clinic for masters and doctoral graduate students of clinical psychology," and the patients/clients are typically seen by students. R. at 414.

7

During the hearing, Plaintiff described her daily activities as consisting of walking around the house, cleaning and trying to remember what she is doing. R. at 30-31. She indicated she lost her waitressing job because she could not remember what she was doing and could not work at Arby's because IBS left her unable to attend to her duties. R. at 31-32. She testified she had not used marijuana since October or November of 2008 and admitted that her condition was greatly improved with medication. She denied suffering side-effects from medication and also denied having difficulties getting along with other people. R. at 40.

The ALJ found Plaintiff's condition did not satisfy or equal a listed impairment because she did not satisfy either the "A" or the "B" criteria. The ALJ found Plaintiff could perform light work with the additional limitations that she could perform jobs that required simple instructions (due to her memory problems) and could not work in direct contact with the public (due to stress and anxiety), but could work in public settings and have brief, work-related contact with supervisors and co-workers. After considering testimony from a vocational expert ("VE"), the ALJ concluded Plaintiff could not return to her past work as a waitress or fast food worker, but could work as a production assembler or housekeeping cleaner.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might

8

accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

## A. Listing 12.04

Plaintiff first contends the ALJ erred in concluding she did not meet the requirements for Listing 12.04. A person who meets a listing is presumed disabled and awarded benefits without further inquiry; accordingly, the standards for meeting a listing are rather high. See Sullivan v. Zebley, 493 U.S. 521, 532 (1990). "The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing. To meet a listing, an impairment must meet all of the listing's specified criteria." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

Listing 12.04 requires a claimant to satisfy either (1) both the "A" and "B" criteria or (2) the "C" criteria. Plaintiff does not suggest she satisfied the "C" criteria, so the only way she can satisfy Listing 12.04 is if she meets both the "A" and "B" criteria. The "A" criteria is not at issue, as Plaintiff appears to have satisfied it. The "B" criteria requires two of the following four conditions: (1) marked restrictions of daily living activities, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation of extended duration.

Plaintiff argues she meets two or more of the conditions in the "B" criteria based on the Medical Source Statements submitted by Dr. Lutz, Dr. Franks, and Nurse Sturdevant. However, there was abundant evidence to justify the ALJ's decision. There was no evidence of repeated episodes of decompensation. There was also no evidence Plaintiff is markedly limited in the activities of daily living; indeed, her testimony establishes remarkably few limitations in this area, and the absence of limitations is confirmed by the statements she made to doctors and therapists. There was also no evidence Plaintiff is markedly limited in her ability to maintain social functioning, and observations and statements made by Plaintiff as well as her doctors and therapists suggests this was not a marked problem for Plaintiff. While it is true some of the

9

Medical Source Statements seem to indicate such limitations exist, there appears no basis for those conclusions (a matter that will be discussed in more detail below). The evidence in the Record provides abundant evidence demonstrating Plaintiff does not meet three of the four "B" criteria, so the ALJ did not err in finding Plaintiff failed to carry her burden of establishing that her condition meets or equals a listed impairment.

## B. Deference to Treating Sources

Plaintiff faults the ALJ for not deferring to the opinions of Dr. Franks and Nurse Sturdevant. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; such an opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). As documented in Part I of this Order, the conclusions in Dr. Franks' MSS are inconsistent with the contemporaneous treatment notes. The ALJ made the same observation, noting "the severity of limitations assessed by Dr. Frank is not supported by the treatment records or totality of the evidence herein." R. at 13. This justifies placing less weight on Dr. Franks' MSS. E.g., Martise v. Astrue, 641 F.3d 909, 926 (8th Cir. 2011). The same observations can be made with respect to Nurse Sturdevant's MSS. In addition, there appears to be no explanation for the significant differences between her June 2009 MSS and her July 2009 MSS. Finally, as noted by the ALJ, Nurse Sturdevant is not an acceptable health care provider under the Social Security Regulations, nor is she a mental health specialist. This does not mean her opinion should be ignored, but it is not entitled to controlling weight.

10

## C. Existence of Substantial Evidence

Plaintiff finally contends the ALJ's decision is not supported by substantial evidence in the Record as a whole.[4] The Court disagrees. The ALJ found Plaintiff suffers from memory problems, stress, and anxiety, and appropriately limited the types of jobs she could perform. The Record did not require imposition of greater stress-related limitations because the Record establishes that Plaintiff's stress and anxiety improves greatly when she takes her medication and chooses not to self-medicate. Reduction in stress, combined with medication, greatly reduces the effects of Plaintiff's IBS; this fact is confirmed not only by the evidence in the Record, but by the fact that Plaintiff's complaints to doctors decreased (almost to the point of nonexistence). Plaintiff's contention that the ALJ misinterpreted Dr. Lutz's opinion is rejected; as explained in Part I, Dr. Lutz indicated Plaintiff either (1) overstated her condition when talking to him or (2) her condition had worsened significantly from the time of the last medical record in her file. This is hardly an endorsement of Plaintiff's credibility, and the ALJ was not obligated to treat it as such.

The ALJ discounted Plaintiff's testimony. Plaintiff contends the ALJ erred in failing to fully consider Plaintiff's testimony and for using "boilerplate language" to find her not credible. The Court concludes Plaintiff under-represents the ALJ's credibility findings. The ALJ started his discussion by acknowledging that he had to "make a finding on the credibility of the statements based on a consideration of the entire case record." R. at 13. The ALJ then spent two pages discussing the entire record before concluding Plaintiff's testimony was not credible to the extent it conflicted with his findings. The ALJ noted conflicts between Plaintiff's statements to doctors and therapists as compared to her present claim. The ALJ noted Plaintiff's failure to follow directions. While not all were identified by the ALJ, the Court's review confirms Plaintiff (1) missed appointments, (2) failed to consistently take medications, and (3) failed to stop using marijuana. The ALJ also noted the abundant evidence that Plaintiff's

---

[4]Plaintiff also presents, as a separate issue, arguments regarding the ALJ's credibility assessment. The Court will address these arguments as part of the evaluation of the entire Record.

11

condition was markedly improved when she followed directions and took her medication.

      Ultimately, the ALJ chose to rely on the treatment records. He explained that he "accorded great evidentiary weight to the treatment records in evidence in conjunction with the expert and qualified opinions of Dr. Lewis and [Dr.] Lutz, who are both qualified and impartial mental health experts." R. at 15. Conflicts in the evidence are matters for the ALJ to resolve, and in this case there was substantial evidence to support his conclusions regarding Plaintiff's residual functional capacity.

### III. CONCLUSION

      For these reasons, the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith  
ORTRIE D. SMITH, SENIOR JUDGE  
DATE: December 14, 2011      UNITED STATES DISTRICT COURT

12

Case 6:11-cv-03020-ODS   Document 11   Filed 12/14/11   Page 12 of 12